UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN WILLIAM EMERY,<br><br>Defendant. | 3:18-CR-30122-RAL<br><br><br>OPINION AND ORDER DENYING<br>MOTION TO SUPPRESS |

     A postal employee noticed that a zip-lock baggie containing a white, crystal-like substance had fallen out of an open box addressed to Defendant Steven Emery. The substance looked like drugs and a field test by the police confirmed that it was methamphetamine. Emery argues that the methamphetamine and the evidence seized because of its discovery must be suppressed because the government conducted an illegal search of the box and baggie. This Court denies Emery's motion to suppress because the government did not engage in a Fourth Amendment search and, in any event, the evidence seized inevitably would have been discovered.

## I.  Facts

     On the morning of May 9, 2018, postal employee Roberta Whiting was working at the post office in St. Francis, South Dakota. T. 28–29. While unloading packages from a cart, Whiting noticed that a toy car and a clear plastic baggie containing a white, crystal-like substance had fallen out of a priority mail box onto the floor. T. 29–31, 35–37, 49–52. The box, which was addressed to Emery and had been shipped from Questa, New Mexico, had one of its side flaps completely

open. Exs. 1-2, 4–5, 7, 27. Believing that the baggie contained drugs, Whiting placed the baggie and the car back in the box, moved it to a back room, and called the Rosebud Sioux Tribe police. T. 32–33, 38, 53, 56.

Captain Iver Crow Eagle arrived about fifteen minutes later. T. 48, 56. Whiting explained what had happened and told Captain Crow Eagle about the suspicious looking substance in the baggie. T. 62. She removed the baggie and car from the box and laid them out for him. T. 63–66, 74. Captain Crow Eagle, who is trained to identify drugs and has over 13 years' experience as a police officer, believed the substance in the baggie to be methamphetamine. T. 61–62, 65, 78. He called drug task force officer Joshua Antman, who came to the post office and weighed and field tested the substance in the baggie.[1] T. 66, 91–92, 101; Ex. 32. The baggie weighed 2.1 ounces and the test was presumptively positive for methamphetamine. T. 66, 92, 101; Ex. 32. In Officer Antman's experience, 2.1 ounces was a high-value amount of methamphetamine and was consistent with the distribution of drugs. T. 90, 102.

Officer Antman and Captain Crow Eagle left in separate vehicles to find Emery. T. 96, 110; Ex. 32. They stopped Emery in his truck less than 20 minutes later and placed him under arrest for the methamphetamine found at the post office. T. 67, 76, 97, 110; Exs. 30, 32, 40. Officer Antman seized a rifle and an open container of vodka he observed in the truck's back seat, along with a straw containing methamphetamine residue from the driver's side door. Ex. 40; T. 97–99, 130.

---

[1]Officer Antman testified that he could not recall whether he field tested the baggie itself or the substance in the baggie. T. 91–92. He testified that because the baggie was resealable, he "probably" opened it and "tested the residue around the substance." T. 92; see also T. 108. The report and recommendation states that Officer Antman field tested the contents of the baggie, and the government has not objected to this characterization. Doc. 55 at 2, 10.

A few hours later, Officer Antman sought a warrant to search Emery's residence and any vehicles found there. Ex. 39. Among other things, Officer Antman cited the evidence seized from the post office and Emery's truck as establishing probable cause to believe that drugs, firearms, and other evidence related to drug dealing would be found in the places to be searched. Ex. 39. A tribal judge granted the warrant and the police executed it that afternoon. Ex. 39; Ex. 32. They seized drug paraphernalia, plastic baggies, firearm ammunition, and rifle magazines. Ex. B; T. 99, 124.

Special Agent Benjamin Estes and Officer Antman interviewed Emery in jail, once on the evening of May 9, 2018, and once the next day. Before both interviews, tribal police read Emery his Miranda[2] rights and Emery waived these rights in writing. Exs. 20–21, 33–34.

A grand jury indicted Emery in the fall of 2018, charging him with two drug crimes and possession of a firearm and ammunition by a prohibited person. Doc. 1. Emery moved to suppress his statements, the contents of the priority mail box, and the evidence seized from his vehicle and residence. Docs. 32, 33, 45. He argued that Whiting and tribal police violated the Fourth Amendment by searching the box without a warrant, that his statements and the evidence seized from his home and vehicle were fruits of this illegal search, and that his Miranda waiver on May 9 was invalid because he was under the influence of methamphetamine. Docs. 33, 45.

Magistrate Judge Mark A. Moreno held an evidentiary hearing during which the government presented testimony from Whiting, Captain Crow Eagle, Officer Antman, Agent Estes, and Thomas Bishop, the postmaster in Pierre, South Dakota. Emery presented testimony from Charlee Archambault, a resident of St. Francis. Judge Moreno recommended denying Emery's motion to suppress, concluding that any detention or seizure of the box was lawful, that

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

tribal officers did not engage in a search under the Fourth Amendment when they visually inspected the baggie and field tested its contents, that Emery's waiver of his Miranda rights was valid, and that the evidence from Emery's residence and vehicle need not be suppressed as fruit of the poisonous tree. Doc. 55.

Emery objects to the report and recommendation, arguing that Judge Moreno erred by crediting Whiting's testimony that she did not open the box, by finding that the government did not search the box or the baggie, and by refusing to suppress his statements and the other evidence as fruit of the poisonous tree. Doc. 61. Emery does not object to Judge Moreno's conclusions that the detention and seizure of the box was lawful and that Emery executed a valid waiver of his Miranda rights.

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." However, "[i]n the absence of an objection, the district court is not required 'to give any more consideration to the magistrate's report than the court considers appropriate.'" United States v. Murrillo-Figueroa, 862 F. Supp. 2d 863, 866 (N.D. Iowa 2012) (quoting Thomas v. Arn, 474 U.S. 140, 150 (1985)). Having conducted a de novo review of those portions of the report and recommendation to which Emery objects, this Court adopts the report and recommendation.

## II.    Factual Objections

Emery argues that Judge Moreno should have disbelieved Whiting's testimony and found that she opened the priority mail box to discover its contents. He contends that the state of the box suggests that a postal employee opened it, that Archambault's testimony undermined Whiting's

4

credibility, and that the evidence indicates that Whiting told law enforcement that she opened the box and extracted its contents. Doc. 61 (citing transcript from suppression hearing and post-hearing Ex. C).

Whiting testified that she did not open or tamper with the box. T. 56. Judge Moreno, who observed Whiting and Archambault testify, made a specific finding that Whiting's testimony was credible while Archambault's was not. Doc. 55 at 11–12. Having reviewed the transcript and all the exhibits, this Court agrees with Judge Moreno that Whiting's testimony was credible and rejects Emery's assertions to the contrary. See United States. v. Lockett, 393 F.3d 834, 837–38 (8th Cir. 2005) ("The magistrate's finding that the officer's testimony was believable is deserving of deference."); United States v. Stoneman, No. CR 09-30101-RAL, 2010 WL 1610065, at *6 (D.S.D. Apr. 20, 2010) ("The Court is entitled to give weight to the credibility determination of the magistrate judge."). The baggie and toy car fell out of the box and onto the floor while Whiting was unloading packages. The contents of the clear baggie were then in plain view and Whiting was able to see that the baggie contained a suspicious-looking white substance. T. 30–32, 36–37, 41, 51, 53. Whiting's viewing of the baggie in these circumstances, when she did not physically intrude into the box, was not a search under the Fourth Amendment. See United States v. Campos, 816 F.3d 1050, 1053 (8th Cir. 2016) (holding that officer's observation of a gun in the defendant's opened bag was not a search because the gun was in plain view).

## III.    Legal Objections

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[3] U.S. Const. amend. IV.

---

[3]"Although the fourth amendment does not apply to the conduct of Indian tribal officials in Indian territory, the same standards are applicable to their actions under the Indian Civil Rights Act of

Because a sealed package placed in the mail constitutes an "effect" under the Amendment, United States v. Jacobsen, 466 U.S. 109, 114 (1984); United States v. Van Leeuwen, 397 U.S. 249, 251 (1970), a warrantless search of such a package is presumptively unreasonable, Jacobsen, 466 at 114; Riley v. California, 573 U.S. 373, 381–82 (2014).

Most of Emery's objections to the report and recommendation concern Judge Moreno's conclusion that the government did not search the box or bag. Under the traditional test derived from Justice Harlan's concurrence in Katz v. United States, 389 U.S. 347 (1967), a "search" occurs when the government infringes on "an expectation of privacy that society is prepared to consider reasonable," Jacobsen, 466 U.S. at 113. More recently, however, the Supreme Court announced a property or trespass-based test, under which a search occurs when the government physically intrudes on a constitutionally protected area to obtain information. Florida v. Jardines, 569 U.S. 1, 11 (2013); United States v. Jones, 565 U.S. 400, 406 n.3 (2012); Azam v. City of Columbia Heights, 865 F.3d 980, 988 n.7 (8th Cir. 2017) (per curiam). According to the Court, "the Katz reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." Jones, 565 U.S. at 409.

Emery argues that the government conducted a search under both the reasonable-expectation-of-privacy test and the property-based test. This Court addresses these arguments in turn.

## A. Reasonable-Expectation-of-Privacy Test

Judge Moreno relied on the Supreme Court's decision in Jacobsen to hold that Captain Crow Eagle and Officer Antman did not violate Emery's privacy interest in the box or baggie.

---

1968." United States v. Schmidt, 403 F.3d 1009, 1013 (8th Cir. 2005); see also 25 U.S.C. § 1302(2).

Doc. 55 at 7–11. Emery objects, arguing that the government conducted a search when Whiting removed the baggie from the box to show it to Captain Crow Eagle and when Officer Antman field tested the white substance in the baggie. Doc. 61.

This Court agrees with Judge Moreno that Jacobsen defeats Emery's arguments under the Katz test. In Jacobsen, a Fed Ex employee discovered a zip-lock bag of white powder after opening a damaged box wrapped in brown paper and a duct-taped tube contained therein. 466 U.S. at 111. The employee placed the bag back in the tube, returned the tube to the box, and called the DEA. Id. The box was sitting open on a desk when the DEA agent arrived. Id. The agent removed the bag from the tube and saw the white powder. Id. He then opened the bag and removed a trace of the white powder with a knife blade. Id. at 111–12. An on-site field test identified the powder as cocaine. Id. at 112.

The Supreme Court in Jacobsen held that the constitutionality of the DEA's conduct "must be tested by the degree to which they exceeded the scope of the private search." Id. at 115. After all, the Court explained, a person loses a reasonable expectation of privacy in an item to the extent it has already been searched by a private party. Id. at 119–20, 126; see also id. at 117 ("Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information . . . ."). In other words, the "Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." Id. at 117. Accordingly, government conduct that simply replicates a prior search by a private party is not a "search" under the Fourth Amendment because it does not infringe on any reasonable expectation of privacy. Id. at 119–20.

Applying this test, the Supreme Court in Jacobsen held that the agent's removal of the powder from the box, tube, and baggie fell within the scope of the private search because the agent

was merely viewing "what a private party had freely made available for his inspection" and his conduct did not disclose anything "that had not previously been learned during the private search." Id. The field test was a different matter, however, as it exceeded the scope of the Fed Ex employee's earlier search. Id. at 122. Nevertheless, the Court held that the test did not constitute a search under the Fourth Amendment because "[a] chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." Id. at 123; see also id. (explaining that "Congress has decided . . . to treat the interest in 'privately' possessing cocaine as illegitimate").

Although Emery argues that Jacobsen is distinguishable because Whiting was a "government agent" rather than a private party, the reasoning in Jacobsen still applies to Whiting's removal of the baggie from the box. The initial intrusion on Emery's expectation of privacy came not when Whiting removed the baggie to show it to Captain Crow Eagle, but rather after the box had broken open and Whiting viewed the baggie lying on the floor. This initial intrusion was lawful under the Fourth Amendment and indeed substantially less invasive than the search by the Fed Ex employee in Jacobsen. And, like in Jacobsen, Whiting's lawful initial intrusion extinguished Emery's reasonable expectation of privacy, at least to the extent that Whiting now knew that the box contained a suspicious looking baggie full of a white, crystal-like substance. Whiting's later removal of the baggie from the box (after she had replaced it there and to show Captain Crow Eagle) did not exceed the scope of the lawful initial intrusion and did not tell her anything she didn't already know. It follows, then, that Whiting did not search the box under the Fourth Amendment when she removed the baggie to show it to Captain Crow Eagle. See id. at 118–20; United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 87 (2d Cir. 2002) (Sotomayor, J.) (holding that a detective did not conduct a search under the Fourth Amendment

8

by reopening a briefcase because the detective's actions fell within the scope of a lawful prior search by airport security personnel); see also United States v. Moore, 943 F.2d 884, 888 (8th Cir. 1991) ("[U]nder the Jacobsen holding, the legality of a subsequent government search is not dependent upon whether the private party conveys the package to a government agent in a sealed or unsealed condition, but rather, whether the government search exceeds the scope of the antecedent private search.").

The so-called "private-search doctrine" in Jacobsen is not the only rationale for holding that Whiting did not need a warrant to remove the baggie from the open box. "A warrantless search can be conducted if law enforcement agents see, within plain view, the contents of a container and it is apparent or a 'foregone conclusion' that such contents are contraband." United States v. Jackson, 381 F.3d 984, 989 (10th Cir. 2004) (citation omitted); see also Wayne R. LaFave, Search & Seizure § 2.2(a) (5th ed. Updated Oct. 2018) (explaining that "if the contents [of a container] themselves are in plain view within an accessible container, then there exists no reasonable expectation of privacy as to those contents and thus no need for a warrant to open the container." (footnotes omitted)). Or, as the Fourth Circuit put it, "[w]hen a container has been legally seized, and its contents are a foregone conclusion, . . . a [warrantless] subsequent search of the container is lawful under the plain view container doctrine." United States v. Williams, 41 F.3d 192, 198 (4th Cir. 1994); see also Illinois v. Andreas, 463 U.S. 765, 771–72 (1983) ("[O]nce a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost." (footnote omitted)). In Williams, for instance, police seized five packages consisting of a brown, opaque material wrapped in cellophane. 41 F.3d at 197–98. Because the circumstances made it a foregone conclusion that the packages contained drugs, the Fourth Circuit held that the police did not need

a warrant to remove the cellophane wrapping from a package, poke a hole in the opaque material surrounding its contents, and perform a field test on a trace of the powder found therein. Id. at 194, 198. Similarly, the Tenth Circuit in Jackson held that the "plain view exception to the warrant requirement"[4] applied to a DEA agent's search of a baby-powder container. 381 F.3d at 989. This "exception" applied, the Tenth Circuit explained, because the information the DEA agent had made it a foregone conclusion that the container held drugs. Id.

The circumstances here made it a foregone conclusion that the box contained contraband. Whiting knew that the box contained a toy car and a baggie with a white, crystal-like substance. She had been trained to identify contraband and believed that the white-crystal like substance was a drug. T. 31–32. This Court has also viewed the substance in the baggie, which does not look like sugar, salt, or some other innocent substance. Although Whiting's testimony suggests that she was not positive that the baggie contained drugs, the foregone-conclusion test does not require "*absolute* certainty." Jackson, 381 F.3d at 989 n.2. Under the plain-view exception, Whiting did not need a warrant to remove the baggie from the open box to show Captain Crow Eagle.

Emery argues next that Jacobsen does not justify the field test of the powder because unlike himself, the defendant in Jacobsen did not challenge the extraction of the powder from the baggie. Regardless of what the defendant in Jacobsen argued, the Supreme Court held that removing a trace of powder from the bag did not violate the Fourth Amendment. See Jacobsen, 466 U.S. at

---

[4]The plain view doctrine is not actually "an exception to the warrant requirement." United States v. Davis, 690 F.3d 226, 232 n.11 (4th Cir. 2012). Instead, the rationale in Jackson and Williams is that no search occurred because the government did not intrude on any privacy interests. Also, this Court is using the phrase "plain view doctrine" to refer to situations where an officer has observed something without physically intruding on a constitutionally protected area. LaFave, Search & Seizure § 2.2(a). This sort of plain view should not be confused with the plain view doctrine from Coolidge v. New Hampshire, 403 U.S. 443 (1971), which concerns the legal justification "for making a *seizure* without a warrant." LaFave, Search & Seizure § 2.2(a).

118 ("In this case, the federal agents' invasions of respondents' privacy involved two steps: first, they removed the tube from the box, the plastic bags from the tube, and a trace of powder from the innermost bag; second, they made a chemical test of the powder . . . . [W]e ultimately conclude that both actions were reasonable . . . ."); see also United States v. Walsh, 791 F.2d 811, 815 (10th Cir. 1986) (noting that the Supreme Court in Jacobsen held that removing some of the white powder from the bag was acceptable). In any event, the plain view doctrine allowed Captain Crow Eagle and Officer Antman to open the baggie without a warrant. See Andreas, 463 U.S. at 771–72; Jackson, 381 F.3d at 989; Williams, 41 F.3d at 197–98; see also United States v. Ramos, 960 F.2d 1065, 1067 (D.C. Cir. 1992) (holding that the defendant did not have a reasonable expectation of privacy in a transparent plastic bag). Captain Crow Eagle and Officer Antman, who both have significant experience in identifying drugs, could plainly see that the baggie contained a white, crystal-like substance that they believed was methamphetamine. T. 61–62, 65, 78, 87–88, 90–91, 95–96. The appearance of the substance—as well as the fact that it would be exceedingly unlikely that a person living two states away would spend the time and money[5] to mail a zip-lock baggie of something that just happened to look like methamphetamine—made it a foregone conclusion that the baggie contained contraband. The field test did not intrude on any reasonable expectation of privacy because it was a foregone conclusion that the bag contained contraband, and the test merely disclosed whether the substance was methamphetamine. Jacobsen, 466 U.S. at 123; Andreas, 463 U.S. at 771–72; Jackson, 381 F.3d at 989; Williams, 41 F.3d at 197–98.

Emery also argues that the contents of the box should be suppressed under the decision in Collins v. Wolff, 337 F. Supp. 114 (D. Neb. 1972). There, a package containing thousands of tablets was mailed to the habeas petitioner. Id. at 115. The tape sealing the package broke while

---

[5]The postage on the box showed that it cost $13.65 to send. Ex. 5.

the package was in transit and the contents of the package were visible when it arrived at the post office. Id. Postal employees called the police, who removed a tablet from the package and performed a test to confirm that the tablet contained amphetamine. Id. The main issue in Collins was whether the package qualified as first-class mail (which required a warrant to be searched) or some lower class of mail (which existing regulations and statutes allowed postal employees to search without a warrant). Id. at 116–17 ("The court finds that the determination of this case must rest essentially on whether or not the subject package was first class mail."). After concluding that the package was first-class mail, the district court made the following statement:

> This court does not see how the "plain view doctrine" can be applied to mail in the custody of the post office department. If the package was broken, it was the fault of the postal department. If the post office can profit from its mishandling, the guarantee against opening and inspection means little indeed. Adequate provision existed for delaying delivery until a search warrant was obtained.

Id. at 117.

The Eighth Circuit affirmed the district court's grant of the habeas petition in a short, per curiam opinion. Collins v. Wolff, 467 F.2d 359 (8th Cir. 1972) (per curiam). It framed the issue on appeal as "whether the District Court erred in finding that a package was mailed as first-class mail and thus under applicable statutes and regulations was not subject to opening and inspection by the Post Office Department without a search warrant." Id. at 360. The Eighth Circuit did not address the district court's comment that the "plain view doctrine" did not apply to a package in the postal service's custody. Indeed, the Eighth Circuit never mentioned that the contents of the package were visible but rather stated in a footnote that the "package was opened and found to contain an amphetamine tablet." Id. at n.1. The Eighth Circuit's failure to address the plain view doctrine was likely because of its decision in Oliver v. United States, 239 F.2d 818 (8th Cir. 1957),

where it held that statutes and regulations govern the legality of a package's search when these statutes or regulations provide more protection than the Fourth Amendment. Id. at 822–23.

Relying on Collins, Emery argues that "postal workers shouldn't be able to benefit from eviscerating citizens' expectation of privacy in their packages by breaking them, even by negligence." Doc. 61 at 7. This Court declines to follow the district court's decision in Collins that the plain view doctrine does not apply to packages within the postal service's custody. First, this rule from Collins is not controlling. Although the Eighth Circuit affirmed the district court's grant of the habeas petition, it did not even mention plain view, let alone hold that the "plain view doctrine" is inapplicable to packages in the post office's custody. Collins, 467 F.2d at 360; see also Hartman v. Smith, 734 F.3d 752, 758–59 (8th Cir. 2013) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (citation omitted)). Second, the district court in Collins did not cite any authority to support the rule that the plain view doctrine does not apply to packages within the custody of the postal service, and such a rule conflicts with more recent case law. See United States v. Hayes, 209 F. App'x 548, 551 (7th Cir. 2006) (applying the plain view doctrine to an envelope that tore open while it was being processed by the post office); United States v. Allman, 336 F.3d 555, 555–56 (7th Cir. 2003) (holding that a "pivot pin" protruding from a package in the postal service's custody was in plain view and provided probable cause to believe the defendant was violating federal firearm laws). Third, the district court in Collins declined to apply the plain view doctrine because it believed that the postal service had mishandled and damaged the package. 337 F. Supp. at 117. Here, however, postmaster Bishop testified that the toy car, which was in a box itself, was large enough to misshape the priority mail box and could have contributed to the box breaking open. T. 24–25; see also Exs. 1; T. 34. Moreover, Whiting

testified that of the twenty or so boxes she removed from a cart and placed on a table, Emery's box was the only one that was open. T. 36–37, 49–53. While the testimony from Bishop and Whiting does not conclusively establish that Emery's box broke open because of improper packaging rather than mishandling by the postal service, it makes this case different from Collins, where the district court apparently had no doubt that the postal service had damaged the package.

### B. Property-Based Test

Emery argues that even if he did not have a reasonable expectation of privacy in the box and the baggie, "the government agents' search of the package" and the extraction and testing of the white substance was illegal under the property-based test announced in Jones and Jardines.

The Supreme Court in Jones held that the police had conducted a "search" under the Fourth Amendment when they installed a GPS device on a suspect's car and used the device to track the suspect's movements for almost a month. 565 U.S. at 404. This conduct was a search, the Court explained, because the police physically intruded on a constitutionally protected area (the suspect's car) to obtain information. Id. at 404–05, 408 n.5. Relying on the property or trespass-based test from Jones, the Supreme Court in Jardines held that the police had engaged in a search by entering the suspect's porch and conducting a drug-dog sniff. Jardines, 569 U.S. at 3–6. Cases like Jacobsen and United States v. Place, 462 U.S. 696 (1983), were distinguishable, the Court explained, because they concerned the reasonable-expectation-of-privacy test. Id. at 10–11. As the Court saw it, the Katz test was "unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." Id. at 11.

Although the property or trespassed-based test may sound simple to apply, Jones and Jardines left some questions unanswered, including what law courts should consult to determine whether a trespass occurred, the level of interference necessary to constitute a physical intrusion

14

or trespass, and whether the test applies to all effects, regardless of where they are located or how they are packaged. United States v. Sweeney, 821 F.3d 893, 899 (7th Cir. 2016) ("Neither Jones nor the common law provides sharp boundaries for the meaning of trespass for our purposes."); Kiel Brennan-Marquez & Andrew Tutt, Offensive Searches: Toward a Two-Tier Theory of Fourth Amendment Protection, 52 Harv. C.R.-C.L.L. Rev. 103, 104–05, 111 (2017) (disagreeing with scholars who have concluded that the trespass test turns "on the actual law of trespass (or physical intrusion)"); Orin S. Kerr, The Curious History of Fourth Amendment Searches, 2012 Sup. Ct. Rev. 67, 69 (2012) (explaining that because no trespass test existed before Jones, courts "called on to interpret the trespass test must do so with little in the way of history or precedent to guide them"); Maureen E. Brady, The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection, 125 Yale L.J. 946, 957–64 (2016) (discussing the questions Jones fails to answer).

After Jones, some have questioned whether the DEA's conduct in Jacobsen would constitute a search under the property-based test. United States v. Ackerman, 831 F.3d 1292, 1307 (10th Cir. 2016) (Gorsuch, J.) ("Reexamining the facts of Jacobsen in light of Jones, it seems at least possible the Court today would find that a "search" did take place [when the DEA agent performed the drug test.]"); Andrew MacKie-Mason, The Private Search Doctrine After Jones, 126 Yale L.J. Forum 326, 327 (2017) ("Jacobsen is irrelevant to the trespass definition of a search under Jones. A prior private search may destroy a person's expectation of privacy, but it does not change whether the police trespassed on a constitutionally protected area in order to obtain information. Therefore, a government trespass that qualifies as a search under Jones is still a search even if its scope is limited to the scope of a prior private search."); LaFave, Search & Seizure § 1.8(b) n.94 (calling this argument in the MacKie-Mason article "cogent[]").

Nevertheless, Emery has not cited any cases establishing that the conduct in this case violates the trespass or property-based test.

Moreover, the conduct Emery complains of would not necessarily violate this property-based test. There was no physical intrusion to obtain information when the clear baggie fell out of the open box onto the floor and was found there by Whiting. Although Whiting replaced the baggie in the box to store it and then removed the baggie from the box to show it to Captain Crow Eagle, Whiting already knew that the box contained a toy car and a baggie of a white, crystal-like substance and it was not trespassing for her to replace the baggie in the box temporarily and then show it to Captain Crow Eagle. Whiting did not search the box, but found the baggie with the white substance on the floor. Nor was she conducting a search by replacing the items in the box and then retrieving them when Captain Crow Eagle arrived. Beyond that, a postal employee reaching into an open box to retrieve a baggie the employee has already seen and believes contains drugs is far different from intruding on a suspect's curtilage to conduct a dog sniff or attaching a GPS device to a suspect's car to track his every movement. See United States v. Tejada, 524 F.3d 809, 814 (7th Cir. 2008) ("The requirement of obtaining a warrant to search inside a container, when the container is known to contain contraband or other evidence of crime, is far from the core of the Fourth Amendment . . . ."). But even if the conduct of Whiting, Captain Crow Eagle, or Officer Antman constituted a search under Jones, the evidence Emery seeks to suppress would still be admissible under the inevitable discovery doctrine.

The Supreme Court adopted the inevitable discovery doctrine in Nix v. Williams, 467 U.S. 431 (1984). This doctrine provides that illegally-obtained evidence is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Id. at 444. The rationale for this

16

doctrine is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." Id. at 443. The Eighth Circuit has held that the inevitable discovery doctrine applies when the prosecution proves by a preponderance of the evidence that: "(1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." United States v. James, 353 F.3d 606, 617 (8th Cir. 2003). But see United States v. Thomas, 524 F.3d 855, 860–63 (8th Cir. 2008) (Colloton, J., concurring) (arguing that the first prong dilutes the standard in Nix and that the second prong unduly expands the exclusionary rule).

The government has shown that the evidence and Emery's admissions inevitably would have been discovered by lawful means. Whiting noticed that a baggie containing a white, crystal-like substance had fallen out of a box addressed to Emery. Based on her training, Whiting believed that the substance was drugs. T. 31–33. She called Captain Crow Eagle and told him about the box and the white-crystal like substance. T. 38, 62; Ex. 30. Whiting's observation of the baggie containing what she believed to be drugs would have been more than enough to obtain a search warrant for the box and its contents. Allman, 336 F.3d at 556 (holding that a pivot pin from an illegal rifle protruding from a package created probable cause to search the package). This warrant would have confirmed that the box contained methamphetamine, which in turn would have led the police to arrest and question Emery, obtain a warrant for his residence and vehicles, and find and seize all of the evidence Emery seeks to suppress. There is a possibility, of course, that had the police taken the time to get a warrant for the box they would not have encountered Emery driving

his truck and would have arrested him elsewhere instead, perhaps at his home or office. But the police still would have discovered the evidence in the truck as the warrant authorized them to search any vehicles belonging to Emery located at his residence. Ex. 39; see also United States v. Reivich, 793 F.2d 957, 963 (8th Cir. 1986) ("[A] vehicle found on a premises (except, for example, the vehicle of a guest or other caller) is considered to be included within the scope of a warrant authorizing a search of that premises.").

The government has also shown that the police were engaged in a substantial, alternative line of investigation at the time the government allegedly violated the Constitution. Once Whiting viewed the baggie, she isolated the box in a back room and reported the white, crystal-like substance to Captain Crow Eagle. Captain Crow Eagle arrived at the post office to investigate the matter before Whiting allegedly conducted a search by removing the contents of the box.[6] The police would have continued to investigate the box even if Whiting had not removed the baggie and shown it to them. Indeed, there is essentially no chance that the police would have simply dropped the matter and allowed Emery to leave with the box. In sum, the police were actively pursuing lawfully-gained information that made discovery inevitable before any illegal conduct occurred.

Emery argues that the inevitable discovery doctrine does not apply "just because officers may have probable cause to search." Doc. 61 at 15. He contends that holding otherwise "would permit the exception to swallow the warrant requirement." Doc. 61 at 15. Emery is certainly correct that probable cause for a search is not by itself enough to make evidence admissible under

---

[6]This Court does not believe that Whiting engaged in a search by replacing the baggie in the box and later removing the contents of the box, but is assuming that this conduct violated the Fourth Amendment for purposes of the inevitable discovery analysis. Officer Antman testified that he would have continued to investigate Emery and the box even if he had not performed the field test on the substance in the baggie. T. 95–96.

18

the inevitable discovery doctrine. United States v. Madrid, 152 F.3d 1034, 1040 n.9 (8th Cir. 1998) (rejecting argument that the inevitable discovery doctrine applies "under any and all circumstances in which the police had probable cause to obtain a search warrant"). And courts have expressed concern that applying inevitable discovery where the police may have had probable cause but decided not to seek a warrant could undermine the warrant requirement. United States v. Christy, 739 F.3d 534, 543 n.5 (10th Cir. 2014); Tejada, 524 F.3d at 813.

But it does not follow that the inevitable discovery doctrine can never be based on the theory that police would have discovered the evidence pursuant to a warrant. Rather, when the government argues that the police inevitably would have discovered the evidence under a search warrant, it must establish that the warrant "would certainly, and not merely probably, have been issued had it been applied for." Tejada, 524 F.3d at 813; see also Christy, 739 F.3d at 541–42 (explaining that inevitable discovery should only apply under such circumstances when the district court "has a high level of confidence that the warrant would have been issued and the evidence obtained" (citation and internal marks omitted)). As the Seventh Circuit explained, this approach lessens the possibility that officers will forgo requesting a warrant because they are concerned that the request would be denied. Tejada, 524 F.3d at 813 ("A requirement of sureness—of some approach to certainty—preserves the incentive of police to seek warrants where warrants are required without punishing harmless mistakes excessively."); see also Christy, 739 F.3d at 543 n.5.

Although the Eighth Circuit has not explicitly adopted the "certainty" test, it applied a version of the test in United States v. Lyons, 957 F.2d 615 (8th Cir. 1992). There, a drug dog alerted to a package and then immediately tore it open, exposing drugs inside. Id. at 616. The Eighth Circuit held that the drugs were admissible under the inevitable discovery doctrine because

had the dog merely alerted, "there would certainly have been probable cause to obtain a warrant to search the package." Id. at 617; see also United States v. Pulido-Ayala, 892 F.3d 315, 319 (8th Cir. 2018) (stating that Lyons held that the drugs were admissible under the inevitable discovery doctrine). In the Eighth Circuit's view, there was no reason to penalize the police "[g]iven the certainty that the course of action [they] were pursuing at the time of the alleged 'search' would have led to discovery of the same evidence forthwith by unquestionably legal means." Lyons, 957 F.2d at 617.

The certainty test is satisfied here. An unlabeled, zip-lock baggie containing a white, crystal-like substance fell out of a priority mail box whose only other contents was a toy car. Whiting, a postal employee who had been trained to identify contraband, saw the substance in the baggie and believed that it was a drug. Beyond these facts, nothing about the package or its contents suggested an innocent explanation for what the substance was or why someone would take the time and money to mail the substance if it was not contraband. Under these circumstances, it was virtually certain that a search warrant for the package would have been issued.

Finally, even if Whiting or the police somehow illegally searched the box, the government's conduct provides little justification for applying the exclusionary rule. After all, the exclusionary rule's purpose is deterrence, and the deterrent value of excluding evidence varies "with the culpability of the law enforcement conduct at issue." Davis v. United States, 564 U.S. 229, 236–38 (2011) (cleaned up and citation omitted) (explaining that the deterrent value is stronger when police misconduct exhibits deliberate, reckless, or grossly negligent disregard of the Fourth Amendment and weaker when it involves only simple, isolated negligence). Removing a baggie of suspected drugs from an open box (after it had fallen out of that box, been discovered, and then replaced into the box) and conducting a field test does not show a reckless or grossly

negligent disregard of Emery's Fourth Amendment rights. Rather, this conduct was completely legal under the long-standing reasonable-expectation-of-privacy test and does not even violate the more recent (and far less developed) property-based test.

## IV.    Conclusion

For the reasons stated above, it is hereby

ORDERED that Emery's motion to suppress, Doc. 32, and supplement, Doc. 45, are denied. It is further

ORDERED that the Report and Recommendation, Doc. 55, is adopted.

DATED this 21st day of June, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE